## UNITED STATES *v.* EDWARDS and others.

*(Circuit Court, D. Kansas.* September 12, 1887.)

PUBLIC LANDS—SALE OF INDIAN LANDS—ACTION TO SET ASIDE PATENT.

An act of congress, passed May 28, 1880, required that applicants for the settlement of certain lands, held in trust for Indians, should have the qualifications of pre-emptors, and that they should be actual settlers, and make payment. After final receipts were issued to parties entering upon tracts of such land, and they were bought and paid for by a third party to whom patents were issued, a bill was filed by the government to set aside the patents, on the ground of fraud, and evidence was offered to show that the parties making the entries had never established residence upon the lands, but were generally about a neighboring town or employed in another state. *Held,* that as the government did not by such evidence clearly and satisfactorily show that it had been defrauded, and that, as the parties entering had the qualifications of pre-emptors, were actual settlers, and had made payment, and the proceedings in the land-office were regular on their face, and free from collusion between the purchaser and the parties entering, a decree would be entered dismissing the bill.

In Equity. Action to set aside patent for public lands.

*Hatton & Ruggles,* for defendant Halsey.

*Harris, Harris & Vermillion,* for defendant Lombard Mortgage Company.

BREWER, J. Fifteen suits have been brought by the United States to set aside the patents to as many different tracts of land in the county of Harper, in this state. The grounds alleged in each bill are fraud in obtaining the patent. One party is a defendant in all the cases. The facts in all are similar, and they may therefore be considered together. The rule to be observed, and the amount of proof requisite in cases of this character, have recently been stated by the supreme court in the *Maxwell Land-Grant Case,* 121 U. S. 325, 7 Sup. Ct. Rep. 1015, as follows:

"We think the general doctrine to be that when, in a court of equity, it is proposed to set aside, to annul, or correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done

upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals. how much more should it be observed where the attempt is to annul the grants, the patents, and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations in which this is attempted are clearly stated and fully sustained by proof."

With that exposition of the law as my guide, I pass to the consideration of the facts of these cases. The final receipts in all these cases were issued in the fall of 1882, and the lands were the same season purchased by the defendant M. H. Halsey. The proceedings in the land-office were regular on their face, and the parties entering the land, the subsequent patentees, were real parties, and not fictitious persons as in the *Moffat Case*; and now, before going further into the details, I am met with this question: Must the entry have been made subject to the provisions of the general pre-emption laws, and if not, what was requisite to entitle the party to it? These lands are a part of the Osage Indian Trust and Diminished Reserved Lands which were ceded by the Osage tribe of Indians to the government by the treaty of January 21, 1867, (14 U. S. St. at Large, 687,) and, as provided in said treaty, were "to be held in trust for said Indians, and to be surveyed and sold for their benefit by the secretary of the interior." On April 10, 1869, by joint resolution of congress, that body provided for the sale of these lands, to "any *bona fide* settler residing upon any portion thereof." This act was re-enacted on July 15, 1870, with some slight changes. In *Foster* v. *Brost*, 11 Kan. 350, the construction of this act came before the supreme court of that state, and it was there held that the claimant's right to purchase was not determined by the general pre-emption law, but rested upon this act. I was a member of that court at that time, and took part in this decision. Two or three subsequent acts were passed by congress which do not require notice, for on the twenty-eighth day of May, 1880, an act was passed which seems to me controls in the matter. The first section makes provision for then residing settlers. The second reads as follows:

"That all the said Indian lands remaining unsold and unappropriated, and not embraced in the claims provided for in section one of this act, shall be subject to disposal to actual settlers only, having the qualifications of pre-emptors. Such settler shall make due application to the register, with proof of settlement and qualifications as aforesaid, and upon payment shall be permitted to enter," etc.

All that is required of the applicant is that he shall have the qualifications of a pre-emptor, that he shall be an actual settler, and that he shall make payment. As the government held these lands under a trust to convert them into cash, its primary object was, of course, to realize as soon and as much as possible, and not, as in respect to public lands

generally, to have them occupied and improved; so it might properly ignore the questions of improvement or length of occupation. The trust was fulfilled when the money was obtained. The land department has recently placed the same construction upon this matter. See the letter of acting Secretary Muldrow to Commissioner Sparks, of date April 26, 1887, approved by the acting secretary, and published in Copp's Land-Owner of June 1, 1887, on page 58. Now, there is no dispute that the money was paid,—$200 for each quarter section,—and it is abundantly shown that defendant Halsey purchased from each party entering his separate tract, paying him $500 therefor. There is not a *scintilla* of testimony to show that these entries were made through any collusion or by virtue of any agreement between Halsey and the parties entering. There is not a particle of testimony that shows that any one of these parties entering did not have the qualifications of a pre-emptor, except, perhaps, as to one party. As to him there is testimony, if competent, that his father said that he was but 17 years of age, and the opinion of one witness that he did not look older than that. On the other hand, there is testimony that he appeared to be a man of age, and his own affidavit attached to his application. With respect to some of the parties entering, there is affirmative and clear testimony that they did reside upon the lands; with respect to others, the testimony is very unsatisfactory. So far as the five parties of the name of Snyder are concerned, evidently they made some improvements with a view to residence, and resided upon the lands at different times, though not continuously. As to the other eight, the improvements were insignificant, and in some cases it is doubtful whether there were any, and it is not affirmatively shown that they ever actually—some of them at least—resided on their tracts. If six months' continuous residence was requisite, I should have no doubt that the government had clearly shown a lack of such residence; but when it comes to the question whether they ever did for a short time actually make a residence, I think in most of the cases the government has failed to prove the negative. After the purchase price had been paid, and the receipts issued and conveyances made by the parties entering to Halsey, it appears that some question arose as to the validity of these entries. A hearing was ordered before the land-office at Wichita, but the hearing was postponed indefinitely; and thereupon Mr. Halsey went to Washington, and applied for a hearing before the commissioner of the land-office, which was granted, and upon such hearing the entries were sustained, and patents thereafter issued. Not one of the parties who made the several entries has been found, or his testimony procured. The testimony of the government is mainly that of witnesses to the effect that these various parties, during the summer and fall of 1882, were generally about the town of Harper, or employed in the Indian Territory, from which it is inferred that they never established any residence upon these lands; and, as to some of the parties, the testimony points strongly in that direction; but when I take into consideration the trust under which the government held these lands, the spirit of this act of 1880, the fact of the actual payment, the evidence of no collusion or conspiracy

between Halsey and the parties entering, it seems to me that I cannot, within the rule laid down by the supreme court as quoted above, hold that the government has clearly and satisfactorily shown that it was defrauded in these entries. It is unnecessary, therefore, to inquire as to the right of subsequent parties purchasing from Halsey, or holding mortgages placed upon the lands for Halsey, being entitled to a decree in his favor. They are also protected. With the failure of the principal attack, the collateral assaults also fail. A decree will be entered in each case dismissing the bill.